IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| EDDIE DONERLSON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 12-00564-N |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Eddie Donerlson, Jr. ("Donerlson") filed this action seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that he was not entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-433, or to Supplemental Security Income benefits (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381-1383c. Pursuant to the consent of the parties (doc. 21), this action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73. *See* Doc. 22. The matter came on for oral arguments on May 9, 2013, at which Sean Frederick Hampton[2] appeared for the plaintiff and Assistant United States Attorney Patricia Beyer represented the Commissioner. Upon consideration of the administrative record (doc. 12), and the parties' respective briefs (docs. 15 and 16) and subsequent oral arguments, the undersigned finds that the decision of the Commissioner is due to be **AFFIRMED.**

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is to be substituted for Michael J. Astrue as the defendant in this suit. *See*, 42 U.S.C. § 405(g).

[2] Sean Frederick Hampton has withdrawn from the case (docs. 24-25) but plaintiff continues to be represented by Colin Edward Kemmerly.

I. Procedural History.

Donerlson filed a Title II application for disability insurance benefits (DIB) on March 25, 2009, and a Title XVI application for Supplemental Security Income benefits (SSI) on September 11, 2009. (Tr. 19). Donerlson claimed an onset of disability as of May 5, 2005. (Tr. 19). He alleged an inability to work based upon the following impairments: post-traumatic stress syndrome (PTSD), diabetes, and neck and pain injury. (Tr. 163). He was fifty-one years old at the time he filed his application (Tr. 19, 737). The application was denied on December 9, 2009 (Tr. 19) and Donerlson requested a hearing (Tr. 61-62) before an Administrative Law Judge ("ALJ"). Following a hearing on January 3, 2011 (Tr. 731-749), the ALJ issued an unfavorable decision on February 18, 2011 (Tr. 19-45). Donerlson requested a review by the Appeals Council (Tr. 12) that was subsequently denied on August 14, 2012 (Tr. 6-8); thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981 (2009).[3] Donerlson has exhausted all his administrative remedies and now appeals from that final decision.

II. Issues on Appeal.

A. Whether the ALJ erred by assigning great weight to the opinions of non-examining, non-treating, state agency psychological and medical consultants, which were inconsistent with the medical evidence of record, to support an unfavorable decision?

B. Whether the ALJ erred by failing to find that Donerlson had a severe impairment of shoulder impingement?

---

[3] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition of part 404, which addresses claims under Title II of the Act. All cited regulations have parallel citations in part 416, which address claims under Title XVI of the Act.

III.   Standard of Review.

   A.   Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).   *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be

overturned where "there is substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

B.        Statutory and Regulatory Framework.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[4]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain

---

[4] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). *Id.* at 1239–40.

IV.     Relevant Facts.

A.     Donerlson's vocational background.

Donerlson was born on September 27, 1958. (Tr. 737).  He was 52 years old on February 18, 2011, when the ALJ issued his unfavorable decision (Tr. 731, 737).  He graduated from the 12th grade. (Tr. 737).  Donerlson last worked from August to September 2011 as a "flag guy" in conjunction with the oil spill cleanup.  (Tr. 738).  Prior to that, he worked as a dishwasher from March to April 2008. (Tr. 738).  From March 18 to May 16, 2006, he worked as an aircraft "fueler" in Ft. Lauderdale, Florida.  (Tr. 195, 738).  From November 2005 to December 2005, he worked as a "Captain of Hurricane Cleanup" in Miami, Florida.  (Tr. 195).  Donerlson's employment history also includes the following:

- Stocker                        February to March 2004
- Delivery Driver                September 2002 to March 2003
- Dishwasher                     August 1999 to September 2002
- Police Officer                 October 1990 to August 1997

(Tr. 196).

B.     Medical Evidence.

On August 24, 2009, Donerlson presented to Dr. Lucile T. Williams, a Clinical Psychologist, for a consultative Mental Examination.  (Tr. 353-354).  There had been no history of psychiatric hospitalization or treatment reported prior to this examination.  (Tr. 353).  Dr. Williams reported that, although he "seems mildly depressed," Donerlson was oriented, had

appropriate affect, was able to subtract serial sevens from 100 to 93,and serial threes from 20, spell "World" forward and backward, recall 5 digits forward and 4 digits backward, and recall 3 of 3 words immediately and 1 of 3 words after 5 minutes. (Tr. 353-354). Donerlson reported his daily activities as follows: "watch TV, wash/dry clothes, go to church whenever it is possible, listen to music, take care of the yard, sit outside, play cards and trivia games with my family [and] try to repair things that need it in the house." (Tr. 354). Dr. Williams concluded that "[i]t is likely that within six to twelve months [Donerlson] will have a favorable response to treatment including psychotherapy." (Tr. 354). Although Donerlson's counsel orally argued that this examining but non-treating clinical psychologist did not have the benefit of certain Veteran's Administration (VA) medical records, he failed to establish that those records contained any evidence inconsistent with Dr. Williams' examination and assessment.

On September 8, 2009, Dr. Charles H. Crump, a state agency medical consultant, provided a Physical Residual Functional Capacity Assessment based upon his review of all Donerlson's medical records.[5] (Tr. 373-380). Dr. Crump concluded that Donerlson could occasionally lift 20 pounds, frequently lift 10 pounds, stand about 6 hours and sit about six hours in an 8 hour workday, could push and or pull but was limited in his ability to reach in all directions, including overhead, could occasionally climb ramps/stairs, stoop, crouch or crawl but never climb ladders/ropes/scaffolds, but could frequently balance and kneel. (Tr. 374-376). These findings equate with the ability to perform light exertion work activity.[6]

---

[5] The MRI performed on June 20, 2011 (Tr. 700), four months following the ALJ adverse decision, does not negate the evidence upon which the ALJ correctly concluded that Donerlson was capable of performing a less than full range of light work (Tr. 24-43).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday[;] [s]itting

On September 4, 2009, M. Hope Jackson, Ph.D., a state agency doctor, completed a Psychiatric Review Technique Form (Tr. 355-372). In connection therewith, she provided a Mental Residual Functional Assessment that Donerlson has no more than a moderate difficulty in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. 365). Dr. Jackson found only Mild restrictions of Donerlson's activities of daily living and no episodes of decompensation. (Tr. 365). Dr. Jackson specifically noted that Donerlson "does housework and yardwork, drives, shops in stores, can handle finances, socializes and gets along with others, no problems getting along with others, can follow written/spoken instructions, can handle stress and changes in routine, no problems concentrating, and understanding but has memory problems." (Tr. 367).

On December 8, 2009, another Mental Residual Functional Assessment was provided by an additional state agency doctor, Donald E. Hinton, Ph.D., who reported that Donerlson was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions and carry them out, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers and maintain socially appropriate behavior, to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, to set realistic goals and make plans independently of others. (Tr. 395-396). The only areas in which it was

---

may occur intermittently during the remaining time." *See* Social Security Ruling (SSR) 83-10, 1983 WL 31251 at *6.

concluded that Donerlson might be moderately limited included the ability to understand and remember detailed instructions and carry them out, to maintain attention and concentration for extended periods, to interact appropriately with the general public, and to respond appropriately to changes in the work setting. (Tr. 395-396). Dr. Hinton also concluded that Donerlson "can attend for two hours with regular scheduled breaks. (Tr. 397).

On March 17, 2010, Donerlson was "seen as a walk-in referral by his [Primary Care physician] Dr. [John B.] Howell." (Tr. 458). The Social Worker, Sherry Bishop, noted that Donerlson "expressed one of the sources of his current distress originates from his understanding he may require insulin if he cannot control his diabetes with diet and exercise." (Tr. 458). Ms. Bishop conducted a "PHQ-9 screen" which resulted in a "Diagnostic Impression" of "Depression." (Tr. 459-460). An initial appointment was then made for Donerlson with Dr. Juliana Fort, a Veterans Administration ("VA") psychiatrist. (Tr. 457, 460-61).

Donerlson presented to Dr. Juliana Fort on March 26, 2010. (Tr. 452-457). Donerlson informed Dr. Fort that he was "unemployed but trying to apply for SSI disability for neck and back problems that happened when he was working." (Tr. 453). He also stated that he was "hoping to get military coverage for his PTSD and the pain in his left shoulder and leg." (Tr. 453). Dr. Fort noted that Donerlson reported no prior psychiatric treatment with either medications or therapy and no rehabilitation other than "some outpatient medication management by his primary care doctor here for sleep."[7] (Tr. 453). Dr. Fort noted, with respect to Donerlson's past medical history:

> The patient reports that he has had whiplash injury to his neck and back causing chronic pain with pain running down the outside of his left leg. He reports he has had a head injury before, which he ran into a pole playing football, but he only

---

[7] This "outpatient medication management" included prescriptions for Amitriptyline and Elavil, which were discontinued because Donerlson reported that they made him "more mad and angry," and for Trazodone, which was reported as "only helping a little bit." (Tr. 453).

had a brief loss of consciousness. However, since his neck and back injury, he does tend to have headaches with some intense pain behind his eyes. The patient also has diabetes . . . [and] trouble with hypertension.

(Tr. 453-454). On examination, Dr. Fort reported that Donerlson was alert and oriented, maintained positive eye contact, was slightly hesitant in speech but spoke at a normal rate and tone. (Tr. 455). Donerlson described his mood to Dr. Fort as "angry and irritable" and complained about concentration problems. (Tr. 455). Dr. Fort reported that Donerlson "seems to broadly smile at any uncomfortable feeling" that she opined was "a defense mechanism and is incongruent with how the patient actually feels." (Tr. 455). Dr. Fort further observed that Donerlson's "[t]hought process are grossly organized and goal directed [and] is noted to have mild to moderate impairment in attention span and concentration." (Tr. 455). Dr. Fort indicated that Donerlson suffered from Postraumatic stress disorder; Mood disorder secondary to general medical condition related to injury to his neck, back, left shoulder and related to chronic pain; and had a "global assessment of functioning of 45 at present." (Tr. 456). Dr. Fort further indicated that Donerlson was affected by the following:

A. The patient's wife is in a lot of chronic pain. She spends half of her time in a house in Florida.

B. The patient has a nephew and a wife's nephew, who are living with them and do not contribute anything to the household.

C. The patient has chronic pain.

D. Sleep problems.

E. Nightmares.

(Tr. 456). Dr. Fort's goals for Donerlson included improving his sleep, increasing his ability to deal with anger, pain and anxiety, improving his knowledge of PTSD, developing new coping skills, and participating in group therapy. (Tr. 457). In addition to group therapy, Dr. Fort

prescribed a trial of Celexa "to target depression and anxiety" and "sleeping medications."[8]  (Tr. 458).

On April 12, 2010, Donerlson attended a group conducted by a clinical psychologist, Damon A. Robinson, "which focused on providing information about PTSD services available through the clinic [and] general information about the typical symptoms of PTSD."  (Tr. 450). Donerlson was reported to have been "an active participant" and to have "completed the PCL-8 with a resultant score which is above the cutoff score consistent with a diagnosis of PTSD."  (Tr. 451).

On April 27, 2010, Donerlson again presented to Dr. Fort. (Tr. 444-448).  He complained of pain in his head, neck, lower back, left shoulder, and nerve pain down his left leg.  (Tr. 445). Donerlson also reported that he was sleeping better and that, when he gets a little rest, he "feels better."  (Tr. 445).  He further reported that his mood "is better now than it was but he is still angry easily."  (Tr. 445).  Dr. Fort reported the same impressions she reported at their first appointment but prescribed a continuation of the Celexa with Restoril and added "a trial of [G]abapentin to help with nerve pain and anxiety."  (Tr. 447).  She also reported that Donerlson "has attended one psychotherapy group and is on the list for the stress management and anger groups."  (Tr. 447).

Donerlson returned to Dr. Fort on May 26, 2010.  (Tr. 441-444).   Donerlson reported that his sleep was "about the same" but that he was not having as many nightmares. (Tr. 441). He complained that he was having more migraines associated with the Gabapentin, which he also reported seriously upsetting his stomach and emotions.  (Tr. 441).  He also complained about "some chronic tingling in his feet" which Dr. Ford associated with his diabetes.  (Tr. 441).

---

[8] Dr. Fort indicated that she would prescribe "a trial of Restoril . . . in the event that the combination of Celexa and [T]razodone is ineffective for insomnia."  (Tr. 456).

Pursuant to her mental status examination, Dr. Fort opined that Donerlson experienced "mild impairment in attention span and concentration." (Tr. 443). Dr. Fort discontinued the gabapentin but continued the prescriptions for Celexa and Restoril and the PTSD treatment with psychology services, and ordered a sleep apnea consult and podiatry consult. (Tr. 443).

Donerlson underwent a sleep study on July 29, 2010, resulting in a diagnosis of "obstructive sleep apnea hypopnea." (Tr. 436-438). The pulmonologist, Dr. Vishal Goel, recommended "treatment of PLMs with Requip and repeating sleep study once he is up to 1-2 mg of Requip." (Tr. 438).

Donerlson attended Anger Management Group on August 12, 2010 (Tr. 434-435), August 19, 2010 (Tr. 433-434), and September 9, 2010 (Tr. 432-433). On September 14, 2010, Donerlson presented to Dr. John Howell, a primary care physician, for a "routine follow-up" reported to be "6 months late." (Tr. 428-431). Dr. Howell reported that, based on the VA Pharmacy records, Donerlson was not getting his medications filed and did not follow-up with physical therapy. (Tr. 428). Dr. Howell further reported that Donerlson's reported pain was "greater than physical findings." (Tr. 431). Dr. Howell's plan included an x-ray of Donerlson's back and neck, a reconsult to physical therapy, encouraging Donerlson to take his medication, and a prescription for Ferritin and Requip. (Tr. 431).

On September 15, 2010, Donerlson underwent examination and testing for PTSD by a Clinical Psychologist Consultant, Dr. Jordan T. Layne, for the VA Compensation and Pension Department. (Tr. 418-428). Donerlson reported to Dr. Layne that "the anger management doesn't really help me, but my sessions with Dr. Ford do [and] the medication helps." (Tr. 419). Donerlson also reported that he had several friends, one from Alabama he talked with several times a week, and some in Florida he talked with "maybe twice a week." (Tr. 421). He also

described his activities and leisure pursuits as including not only doing "the yard and [] stuff around the house," but "boxing." (Tr. 421). Dr. Layne reported that Donerlson was "Cooperative, Friendly, Relaxed, [and] Attentive" during the examination and exhibited appropriate affect. (Tr. 422). Dr. Layne stated that Donerlson experienced no problems with his activities of daily living. (Tr. 423). Dr. Layne reported Donerlson's PTSD symptoms as occurring "daily to weekly to bi monthly, mild to moderate, vary in time frames." (Tr. 424). Donerlson reported that he did not pay much attention to his PTSD until about 2004." (Tr. 424). Dr. Layne reported that the psychological testing administered to Donerlson produced the following results:

> 61-PTSD diagnosis suggested (computer score read 64, however, [Donerlson] indicated that he overendorsed an item, thus decreasing the score by 3.)

(Tr. 425). Dr. Layne nonetheless concluded that the test results were "Probably Valid" and explained:

> [Donerlson's] performance on symptom validity testing indicated that his response style was suboptimal. As a result, this examiner was unable to obtain an accurate presentation of any symptoms he may be experiencing. This is not to state that [Donerlson] is feigning symptoms, but rather that his approach to testing administered prevented this examiner from determining the severity of any symptoms that may be present for the purposes of disability examination.

(Tr. 425). Dr. Layne's diagnosis included a determination that Donerlson had no difficulty managing his financial affairs and that a social work assessment was unnecessary because there were no apparent difficulties in this area. (Tr. 425). Although Donerlson's PTSD was related to his reported Lebanon experiences, an accurate diagnosis of PTSD could not be made due to Donerlson's "performance on objective assessment and [Dr. Layne's] subsequent inability to obtain an accurate symptom presentation for disability purposes." (Tr. 426).

On December 13, 2010, Donerlson presented to Dr. Geoffrey Daugherty requesting "physical therapy and pain management for neck." (Tr. 516).[9] Dr. Daugherty's examination revealed no deformity and no tenderness or spasm on palpation of the neck. (Tr. 518). Donerlson could touch his chin to his chest in flexion, can look upward to about 80 degrees in extension and had a lateral flexion of 30 degrees to the right and 40 degrees to the left, and had a rotation of the neck about 30 degrees to the right and 45 degrees to the left. (Tr. 518). Dr. Daugherty ordered an MRI of the neck. (Tr. 519) but the only MRI results contained in the file involve the MRI of Donerlson's left shoulder performed on June 20, 2011, four months following the ALJ's decision (Tr. 700). The evidence of record does include the following report of an x-ray taken on September 14, 2010 of Donerlson's Cervical Spine:

> There is no acute fracture, dislocation or bony destructive lesion. There is mild disc space narrowing at C5-6 and C6-7 levels. The precervical soft tissues are normal in thickness.

> Impression: Degenerative disc disease at the C5-6 and C6-7 levels.

(Tr. 481). An x-ray was also taken on September 14, 2010 of Donerlson's Lumbar Spine, which resulted in this report:

> There is no acute fracture, dislocation or bony destructive lesion. The disc spaces appear fairly well maintained, but there is degenerative spurring laterally at the L3-4 level. Degenerative facet disease is noted at the L5-S1 level. Metallic sutures overlie the lumbar spine, from unknown surgery. Flexion and extension views were not performed.

> Impression: Degenerative disc disease and degenerative facet disease. Flexion and extension views were not performed and the study is considered incomplete.

(Tr. 482).

---

[9] Donerlson reported that he was being seen in physical therapy in Biloxi but that they would only treat his back, not his neck, because "they say that is all the doctor ordered." (Tr. 516). Dr. Daugherty noted, however, that a subsequent consult was placed on December 8, 2010 for his neck and that he had an appointment scheduled for such evaluation on December 27, 2010. (Tr. 516).

C.    Donerlson's Testimony.

At an administrative hearing held on January 1, 2011, Donerlson testified he had not worked since August to September of 2010 when he worked for the oil spill clean up as a "flag guy." (Tr. 738). Prior to that job, he last worked in April of 2008 as a dishwasher. (Tr. 738). Donerlson testified that he has diabetes for which he takes pills rather than insulin shots. (Tr. 739). He is receiving physical therapy twice a week for his neck, back and shoulders. (Tr. 739-740). He reports that his neck, back and shoulders are being treated conservatively at this time. (Tr. 740). He is still using his CPAP machine and it is working "pretty good" when he takes his medicine. (Tr. 741).

Donerlson also testified that he could only walk or stand for 30 minutes before experiencing pain and can only sit for five minutes, shifting from side to side. (Tr.742-43). At the time he testified, he was on 7 or 8 medications which he contended caused a number of side effects, including dry cough, diarrhea, sometimes constipation, dizziness, unsteady on his feet, coughing and difficulty thinking. (Tr. 744).

D.    Vocational Expert's Testimony.

James Douglas Miller, the Vocational Expert (VE), was called to testify by the ALJ regarding Donerlson's past relevant work. (Tr. 745). He concluded that it ranged from medium to heavy and from unskilled to skilled. (Tr, 745). Mr. Miller was then presented with a hypothetical of a man Donerlson's age, education and work background who was limited to performing a full range of light work, but precluded from performing overhead work, including lifting and carrying overhead, and from climbing ladders, ropes and scaffolding; while being permitted to frequently balance and kneel, but only occasionally crawl, crouch, stoop and climb stairs; and occasionally push and pull arm controls. (Tr. 24-25, 745-746). The individual could

also perform simple, routine and repetitive tasks (SRRTs), could have brief, superficial contact with the public, could adapt to minimal changes in settings, and could maintain attention and concentration for two hours at a time. (Tr. 25, 746).

Mr. Miller testified that such an individual could perform the following unskilled jobs: cafeteria attendant (DOT 311-677-010) which is light, unskilled with an SVP level of two about 172,000 jobs available nationally and 12,000 available statewide; school bus monitor (DOT 372-667-042) which is light, unskilled with an SVP level of two about 142,000 jobs available nationally and 28,000 available statewide; poultry worker (DOT 525-687-074) which is light, unskilled with an SVP level of two about 118,000 jobs available nationally and 19,000 available statewide; cleaner housekeeper (DOT 323-687-014) which is light, unskilled with an SVP level of two about 177,000 jobs available locally and 26,000 available statewide. (Tr. 746-747).

A second hypothetical was presented in which the individual of Donerlson's age, education and work experience could sit, stand, or walk for no more than 30 minutes at a time and would have to change positions every 30 minutes, and could maintain attention and concentration for no more than one hour at a time. (Tr. 747). Mr. Miller testified that there would exist no jobs for such an individual. (Tr. 747-748).[10]

E.    ALJ's Decision.

The ALJ found at step two that Donerlson's degenerative disc disease (DDD) of the cervical and lumbar spines, diabetes, hypertension, sleep apnea, posttraumatic stress disorder (PTSD) and depression were severe impairments (Tr. 21), but determined at step three that Plaintiff had not met his burden to show that his impairments or combination of impairments

---

[10] Mr. Miller similarly testified that no work existed for someone who had to take unscheduled breaks throughout the workday due to pain and medicine side effects, including drowsiness, dizziness, and frequent diarrhea, and would be absent from work more than four times per month due to severe pain, and medication side effects. (Tr. 748).

"meets or medically equals one of the listed impairments at 20 C.F.R. pt. 404, subpt. P, app. 1."

(Tr. 22, Finding 4).

V.    Analysis.

A.    **The ALJ properly evaluated the objective medical evidence of record and the Commissioner's decision to deny benefits is supported by substantial evidence.**

Donerlson argues that the decision to deny him benefits was not based on substantial evidence because great weight was assigned to non-examining, non-treating, state agency psychological and medical consultants whose opinions were inconsistent with his treating physicians.  (Doc. 15 at 2-3, *citing* Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990)(The opinion of non-examining reviewing physicians are entitled to little weight and, taken alone, do not constitute substantial evidence to support an administrative decision).  Donerlson argues that the state agency psychological consultant's conclusion that he was moderately limited in very few areas, is inconsistent with Dr. Fort's conclusion on multiple occasions that he had a global assessment of functioning (GAF) score of 45, which "infers more than moderate limitations." (Doc. 15 at 2-3).  At oral arguments, Donerlson's counsel referred specifically to Dr. Fort's GAF impression at Tr. 443, 447 and 454.[11]

The Global Assessment of Functioning (GAF) Scale describes the overall psychological, social, and occupational functioning resulting from mental illness, but without inclusion of any impaired functioning caused by physical or environmental limitations. A GAF score of 51-- 60 indicates moderate symptoms, or moderate impairment in these areas. Diagnostic and Statistical Manual of Mental Disorders, American Psychiatric Association, 4th ed. (1994) at 32.   The Rules

---

[11] Donerlson's counsel actually cited Tr. "443, 445, and 446" but, of these citations, only Tr. 443 contains Dr. Fort's impression of Donerlson's GAF.  Dr. Fort's two remaining notations of her impression that Donerlson's GAF was 45 are located at Tr. 447 and 454.

and Regulations of the Social Security Administration provide, with respect to the "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," in pertinent part:

> We did not mention the GAF scale to endorse its use in the Social Security and SSI disability programs, but to indicate why the third sentence of the second paragraph of proposed 12.00D stated that an individual's medical source "normally can provide valuable additional functional information." To assess current treatment needs and provide a prognosis, medical sources routinely observe and make judgments about an individual's functional abilities and limitations. The GAF scale, which is described in the DSM-III-R (and the DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. ***It does not have a direct correlation to the severity requirements in our mental disorders listings***.

65 FR 50746-01, 50764-50765 (2000 WL 1173632 at 2) (emphasis added). In the present case, the ALJ noted Dr. Fort's GAF 45 notations (Tr. 40) but also observed the subsequent notations by Dr. Fort and other treating professionals which indicated that Donerlson was improving with treatment (Tr. 40). The ALJ noted the following:

> Dr. Fort diagnosed the claimant with PTSD and mood disorder secondary to general medical condition. She assigned the claimant a global assessment of functioning (GAF) score of 45. [Claimant] said he would like to try Celexa, as his wife has taken it before. Dr. Fort also initiated a trial of Restoril in the event that the combination of Celexa and Trazodone, which claimant said was somewhat helpful, is ineffective for insomnia. The claimant underwent a group therapy session with Nathanial Abston, Jr., PhD, a clinical psychologist and Theresa A. Rozum, LICSW, on April 15, 2010. They noted the claimant was an active participant; but he did not identify a specific trauma causing his PTSD. Dr. Abston noted the claimant's chart indicated that he is a veteran of the Vietnam era, and has previously discussed traumatic military events. The claimant also expressed interest in the anger management, mood management and stress management therapy groups, and was referred to these groups. The claimant followed up with Dr. Fort on April 27, 2010, and reported that he was sleeping much better. He told Dr. Fort that the Trazodone caused him to wake up feeling irritated and aggravated, so he is not taking it. He also said the Restoril helps some. Dr. Fort noted the claimant said his mood was better now than it was, but he is still angry [sic] easily. He reported vague thoughts of wanting to hurt others without a specific plan. Despite some reported improvement, Dr. Fort assigned the same GAF score of 45. When the claimant saw Dr. Fort for follow-up on May 26, 2010, he reported that his sleep was about the same, and he was not having as many nightmares. The claimant said he does think he has restless legs at night and that he snores loudly sometimes and wakes himself. The claimant told Dr.

Fort that he has been having more migraines since his last visit, which he attributed possibly to his Gabapentin, which he said he was not taking regularly because it caused stomach and emotional upset. Dr. Fort continued the claimants medications. The claimant attended several sessions of the anger management group and the PTSD group in August and September 2010. (Exhibit 18F [Tr. 417-494]).

On September 15, 2010, the claimant underwent an initial evaluation for PTSD with Dr. Layne with the VA Compensation and Pension department. The claimant reported that "I would say the anger management doesn't really help me, but my sessions with Dr. Fort do . . . the medication helps." During the psychiatric examination, Dr. Layne noted the claimant was cooperative, friendly, relaxed and attentive. His affect was appropriate and mood was neutral. His attention was intact. The claimant had no inappropriate behavior, obsessive/ritualistic behavior, panic attacks, episodes of violence, or suicidal/homicidal thoughts. Dr. Layne said the claimant had fair impulse control. His memory was grossly intact. The claimant reported that his PTSD symptoms occur daily to weekly to monthly, are mild to moderate, and vary in time frames. He said, "I didn't start to really pay these problems more attention until about 2004, I guess." Dr. Layne noted the claimant's psychometric score of 61 results in a suggested PTSD diagnosis. He noted, however, that the claimant indicated that he over endorsed an item, thus decreasing his computer score from 64 to 61. Dr. Layne noted the claimant's performance on symptom validity testing indicated that his response style was suboptimal. As a result, he could not obtain an accurate presentation of any symptoms the claimant may be experiencing. Dr. Layne noted that this did not necessarily mean that the claimant was feigning symptoms, but rather that his approach to testing prevented him from determining the severity of any symptoms that may be present. Dr. Layne concluded that the claimant does not meet the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) criteria for a PTSD diagnosis. He assigned a GAF score of 65-75. (Exhibit 18F [Tr. 417-494]).

(Tr. 40-41).

The ALJ also discussed (Tr. 38-39) the Mental Residual Functional Assessments performed by Dr. M. Hope Jackson on September 4, 2009 (Tr. 365-367), and by Dr. Donald E. Hinton on December 8, 2009 (Tr. 395-396). Dr. Jackson concluded that Donerlson has no more than a moderate difficulty in maintaining social functioning and in maintaining concentration, persistence or pace, and found only mild restrictions of his activities of daily living. (Tr. 365). Dr. Hinton presented a more expansive assessment, finding that Donerlson was not significantly

limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions and carry them out, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerance, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers and maintain socially appropriate behavior, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, to set realistic goals and make plans independently of others. (Tr. 395-396). The only areas in which Dr. Hinton concluded that Donerlson might be moderately limited included the ability to understand and remember detailed instructions and carry them out, to maintain attention and concentration for extended periods, to interact appropriately with the general public, and to respond appropriately to changes in the work setting. (Tr. 395-396). Dr. Hinton also concluded that Donerlson "can attend for two hours with regular scheduled breaks." (Tr. 397).

Although Donerlson argues that these Mental Residual Functioning Assessments are somehow inconsistent with that of Dr. Fort, the record is devoid of any functioning assessments, specific or otherwise, by Dr. Fort. Although Donerlson argues that Dr. Fort's assignment of a GAF score of 45 "infers more than moderate limitations" (doc. 15 at 2-3), he provides no evidence as to the nature of the limitations he asks the Court to infer, or that Dr. Fort intended such an inference to be drawn, or that her GAF score of 45 is itself based on any objective medical evidence such as psychological test results. Donerlson does not identify any objective medical evidence in the record to support Dr. Fort's GAF score of 45. Dr. Fort did not perform a

mental residual functioning assessment nor did she opine that Donerlson was limited in any aspect of functioning capacity.

Donerlson also challenges Dr. Charles H. Crump's Physical Residual Functional Capacity Assessment (Tr. 373-380) but offers no objective medical evidence as inconsistent.[12] Specifically, Donerlson first alleges that Dr. Crump "indicated that the Plaintiff was not limited in pushing and pulling arm and foot controls" when he actually limited his ability to reach in all directions, including overhead. (Tr. 276). Donerlson then relies on his own complaints of pain to his physicians (doc. 15 at 3) but has failed to point to any evidence of any limitation imposed by a treating physician. The ALJ did not err in concluding that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." (Tr. 27). "[T]he decision concerning the Plaintiff's credibility is a function solely within the control of the Commissioner and not the courts." Sellers v. Barnhart, 246 F. Supp. 2d 1201, 1213 (M.D. Ala. 2002). The assessment of a claimant's credibility about pain and its effect on his ability to function must be based on consideration of all the evidence. See 20 C.F.R. § 404.1529; SSR 96-7p. Moreover, "the severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986); 20 C.F.R. § 404.1529(a) (we will determine the

---

[12] To the extent the ALJ relied upon the state agency doctors' assessments to determine Donerlson's residual functional capacity, any error was harmless because the ALJ articulated several other factors which independently supported her findings. See, Shinseki v. Sanders, 556 U.S. 396, 410(2009).

extent to which your alleged functional limitations and restrictions due to pain can reasonably be accepted as consistent with the medical signs and laboratory findings).

Here, the ALJ found that although plaintiff's underlying medical condition could reasonably be expected to produce the symptoms alleged, his statements concerning the intensity and limiting effects of his symptoms were not credible (Tr. 27). To the extent plaintiff argues the ALJ did not consider the fact that he consistently sought treatment for pain, his argument is unavailing.   It is evident that plaintiff has some pain. The ALJ specifically noted plaintiff has sought treatment for neck and back pain many times since 2006 (Tr. 27-33). However, while consistent treatment for pain may support plaintiff's pain allegation, it is not conclusive evidence of pain so disabling as to preclude performance of all substantial gainful activity.

In making her assessment of plaintiff's credibility about pain and its effect on his ability to function, the ALJ based her assessment on consideration of all the evidence of record, not just the fact that plaintiff sought treatment. *See* 20 C.F.R. § 404.1529; SSR 96-7p.  In the instant case, after considering all of the evidence, the ALJ reasonably concluded that plaintiff's subjective complaints were not entirely credible. Donerlson himself acknowledges that he has been treated conservatively for his neck, back and shoulder pain, and he does not deny that the record shows several gaps in treatment.  (Tr. 740).   He points to no specific limitation imposed by any one of his treating physicians which is inconsistent with the ALJ's RFC assessment.  Nor does he challenge the ALJ's reliance on his own report regarding his wide range of daily activities, including the fact that he "takes care of household repairs, ironing, laundry, mowing the grass, weed trimming, and cleaning."  (Tr. 33, 141).  Donerlson also reported that he works out in a pool twice a week. (Tr. 33, 143).  He also reported to Dr. Layne that, despite his difficulty

reaching overhead because of his shoulder, he continues to engage in his hobby of boxing. (Tr.

33, 421). Moreover, no treating physician has opined that Donerlson cannot perform light work

activity. (Tr. 42). *See* 20 C.F.R. § 404.1529(c)(3)(v) (an ALJ may consider the extent of

treatment received in assessing pain). Significantly, Dr. Terry W. Taylor, who examined

Donerlson on August 22, 2010, noted that, although he was diagnosed with low back pain,

degenerative disc disease of the lumbar, and history of chronic back pain, he appeared to be

healthy and was able to move without difficulty. (Tr. 203). Dr. Taylor's physical examination

revealed the following:

> Bruising is absent. Movement of the low back does not cause pain. Range of
> motion is normal. . . . Sensation in the lower extremities is normal. Straight leg
> raising test is negative bilaterally. Spasm is not present in the paraspinous
> muscles. Squatting can be performed. Heels standing and walking can be
> performed. Toes standing and walking can be performed. Strength testing in the
> lower extremities demonstrates that all muscle groups are 5/5. Mild tenderness to
> palpation is present in the lumbar paraspinous muscles.

(Tr. 203). *See* 20 C.F.R. § 404.1529(c)(3) (the ALJ may consider the observations of others in

assessing the extent of Plaintiff's pain).

> **B.      The ALJ did not err by failing to find that Donerlson had a
> severe impairment of shoulder impingement.**

Donerlson next argues that the medical records "support the conclusion that the Plaintiff

has a severe impairment of shoulder impingement with degenerative factors." (Doc. 15 at 4; no

citation to the record).[13] He also contends that, in 2010, he "had muscle weakness of the left

supraspinatus and positive foraminal compression." (Doc. 15 at 4, *citing* Tr. 259-279). He then

---

[13] Although Donerlson fails to cite to any record evidence which sufficiently supports his
contentions, the ALJ properly considered and discussed all of Donerlson's allegations of disabling
physical and mental impairments, including repeated references to his alleged shoulder impairment and
treatment. (Tr. 26, 27, 29, 30 ).

contends that he "was treated for shoulder pain and numbness in his left arm." (Doc. 15 at 4, *citing* Tr. 567-577).[14]

There is evidence in the record of an x-ray taken of Donerlson's shoulders on May 26, 2010, which resulted in this report:

> Views of the right and left shoulders demonstrate no evidence of fractures or dislocation. The joint spaces are within normal limits except for a minimal narrowing of the right acromoiclavicular joint. No osteoblastic or osteolytic lesion is visualized.
>
> Impression: Mild degenerative change in the right acromioclavicular joint otherwise normal right and left shoulders.

(Tr. 483). The record also contains medical records relating to treatment received after the ALJ's denied benefits on February 18, 2011. Specifically, on June 17, 2011, during a follow-up visit to Dr. Tao Chen from Physicians' Pain Specialists of Alabama, P.C. following a "Lumbar Epidural Steroid Injection with Flouroscopy" procedure on May 17, 2011, Donerlson complained about shoulder pain and was referred for an MRI of his left shoulder. (Tr. 701-703). The MRI was performed on June 20, 2011, and revealed:

> FINDINGS:
> The long head of the biceps tendon lies in the bicipital groove. The glenoid labrum shows degenerative posteriorly with approximately 50% of the substance missing. The anterior, superior and inferior labral quadrants are satisfactory. This is a type II acromion configuration with acromioclavicular spurring creating impingement on the supraspinatus. There is partial thickness tearing along the bursal surface. Normal appearance of the infraspinatus and subscapularis are present. There is no shoulder effusion. Marrow signal of the humeral head is satisfactory.

---

[14] The following observation appears in the medical progress notes dated April 24, 2009:

> Muscle weakness of the left supraspinatus (grade +3). Foraminal compression is positive bilaterally.

(Tr. 261). There is, however, absolutely no reference in any portion of the progress note dated April 24, 2009, to Donerlson's shoulder. The sole topic of this note is his "neck pain" and "the mid and lower cervical muscles." (Tr. 261).

IMPRESSION:
1.      Subacromial and acromioclavicular impingement of the supraspinatus
        with partial thickness tearing along the bursal surface and degenerative
        tendinopathy.  No full thickness perforation or retraction is evident.


2.      Degenerative erosion of approximately 50% of the posterior glenoid
        labral quadrant without articular surface tear or unstable configuration.

(Tr. 700, emphasis in "Impression" omitted).   No other reference to this MRI is contained in the

record.  No medical care provider has commented about the significance of this finding and there

is no indication that this condition has, in any fashion, restricted Donerlson from performing any

activity or function consistent with the ALJ's RFC and finding that plaintiff is capable of

performing the full range of light work "as defined in 20 C.F.R. § 404.1567(b) and  §

416.967(b), in function by function terms (SSRs 83-10 and 06-8p)."  (Tr. 24).  In the final

analysis, the record does not support any contention that Donerlson's left shoulder problem, even

if designated as a severe impairment, would alter the correctness of the ALJ's conclusion that

"[t]he claimant does not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."

(Tr. 22).  Consequently, plaintiff has failed to establish that he is disabled and that the ALJ erred

in finding otherwise and denying his application for benefits.

CONCLUSION

For the reasons stated above, it is **ORDERED** that the decision of the Commissioner of

Social Security denying plaintiff's benefits be and is hereby **AFFIRMED**.

**DONE** this  14th  day of November, 2013.


                                        /s/ Katherine P. Nelson
                                        **KATHERINE P. NELSON**
                                        **UNITED STATES MAGISTRATE JUDGE**